**THIRD DIVISION**
**DOYLE, P. J.,**
**HODGES and WATKINS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

June 18, 2024

# In the Court of Appeals of Georgia

A24A0237. PREVIEW RESTAURANTS, LLC v. SHOPS AT 2221 PEACHTREE, LLC.

DOYLE, Presiding Judge.

In this commercial dispossessory action, Preview Restaurant, LLC (hereinafter the "Tenant") appeals the grant of a writ of possession to Shops at 2221 Peachtree, LLC (hereinafter the "Landord"). The Tenant asserts two enumerations of error: (1) the trial court erred when it concluded that the Landlord properly terminated the lease; and (2) the trial court erroneously admitted hearsay evidence. For the reasons below, we find no error and affirm the trial court's judgment.

"In dispossessory actions, we apply a de novo standard of review to legal issues decided by the trial court, and factual findings made by the trial court shall not be set

aside unless clearly erroneous."[1] The record shows that in January 2022, the parties entered into a Sixth Shopping Center Lease Assignment, Assumption, and Modification Agreement (the "Lease"), wherein the Landlord agreed to lease space in its shopping center to the Tenant for the purpose of opening a restaurant.[2] In the early morning hours on October 29, 2022, there was a fire at the restaurant, and the Atlanta Fire Rescue Department determined the fire was caused by "hot ash remains/hot hookahs in a cardboard box heated to the point of combustion [and that] [t]he fire spread to other nearby combustibles." The Landlord investigated the extent of the damage, and on November 21, 2022, notified the Tenant that it was exercising its right to terminate the Lease under Section 9.4 of the lease and demanded possession of the Premises.[3] Section 9.4 provides, in part:

---

[1] (Punctuation omitted.) *Drury v. Security State Bank*, 328 Ga. App. 39 (759 SE2d 635) (2014).

[2] The Tenant was not the original tenant under the terms of the Lease, but the Lease had been assigned multiple times, and the original lease terms were incorporated into each assignment.

[3] In the letter terminating the Lease, the Landlord also pointed out that Tenant was in violation of the use restriction in the Lease because it was operating a club and hookah bar, when the premises was leased only for the purpose of operating a restaurant. Section 12 (a) provided that "[a]s of the date first above written, the Use of Premises shall be a full-service restaurant offering a combination of American and

9.4 DAMAGE BY FIRE OR OTHER CASUALTY. Tenant shall immediately notify Landlord of any damage or destruction to the Premises. In the event that (A) by reason of damage or destruction, the Premises is rendered wholly untenantable, . . . then, in any of such events, Landlord may elect either to (i) restore the Premises . . . , or (ii) terminate this Lease by notice of termination delivered to Tenant at any time after the occurrence of such damage or destruction, whereupon this Lease shall expire upon the date set forth in such notice, and Tenant shall vacate and surrender the Premises to Landlord on such date. Landlord shall give notice to Tenant of such election within sixty (60) days after the occurrence of such damage or destruction. . . .

The Tenant did not surrender the premises.

The Landlord filed its "Proceeding Against Tenant Holding Over" against Anchorex, Inc. and Michael A. Efuetlateh in state court on November 30, 2022. Both defendants filed an answer by special appearance and moved to dismiss the action based on insufficiency of service of process. The Tenant and two individuals were added as defendants in January 2023, and an amended answer was filed on behalf of all five defendants. On February 17, 2023, the trial court entered an order dismissing Anchorex, Inc., and the individual defendants. In its order, the trial court found that

---

Mediterranean cuisines."

the affidavits of service filed with the court established that Efeutlateh was properly served, individually, and that as the Tenant's registered agent, he was also authorized to accept service on the corporate entity's behalf.

Also on February 17, 2023, the trial court entered its "Order Regarding Inspection of Damages and Restoration Cost," which addressed the parties' dispute with respect to the Landlord's right to terminate the Lease under a different section of Paragraph 9.4 of the Lease. That section provided:

> [n]otwithstanding anything contained in this Paragraph 9.4 to the contrary, in the event that the [r]estoration [c]osts exceeds the aggregate sum of [m]inimum [r]ent for the Lease Year in which the damage or destruction occurs, Landlord shall be entitled to terminate this Lease rather than perform such restoration, by giving notice of termination to Tenant, which notice must be given within twenty (20) days after Landlord . . . becomes aware of such damage or destruction, and . . . ascertains the approximate or exact [r]estoration [c]ost.

The Lease defined "restoration cost" as "[t]he total cost to restore damage or destruction to the Premises." The court found that "the issue of the [r]estoration [c]ost . . . may be dispositive in this matter, if the landlord chooses to elect that option where the damages exceed the annual rental income of the leased property." The

4

court went on to order the parties to confer and identify an agreed-upon vendor or set of vendors from the list provided by the Landlord's insurance company to provide estimates of the restoration cost and to submit estimates to the court. After the parties were unable to agree on a vendor, the trial court held a hearing in which it ultimately selected the vendor to conduct the remediation work at the premises, ordered the Tenant to provide access to the space, and ordered the Landlord to select the restoration contractor to perform reconstruction after remediation.

On January 5, 2023, the Landlord received an estimate for the initial cost to perform the remediation work in the amount of $87,500.00.[4] Several months later on April 18, 2023, the Landlord received the reconstruction estimate, which could not be prepared until the remediation work concluded and totaled approximately $168,200.00. On the next day, April 19, 2023, the Landlord notified the Tenant in writing that it was exercising its right to terminate the Lease pursuant to the restoration cost provision of Section 9.4, which allowed termination if the restoration cost exceeded the aggregate yearly rent. The estimates for remediation and restoration totaled $253,950.00; the annual rent was approximately $67,562.04. The trial court

---

[4] The letter is inaccurately dated January 5, 2022, as the fire at issue occurred in October 2022.

held its final hearing in June 2023, after which it granted the Landlord a writ of possession. This is the order from which the Tenant appeals.

1. The Tenant argues that the trial court's finding that it was a holdover tenant is erroneous because the Landlord did not provide timely notice of termination under the Lease. We disagree.

> Where a lessee has breached a lease, the lessor is authorized to rescind the lease and summarily dispossess the lessee as a tenant holding over. When a tenant fails to discharge his obligations under the lease, the landlord has the right, created by the lease itself, to terminate the lease. Once the landlord terminates the lease and the tenant refuses to vacate, the tenant becomes a tenant holding over beyond the term of the lease. The landlord has the right, at that point, to institute dispossessory proceedings by making demand for possession.[5]

We are governed by the following with respect to the interpretation of a lease:

> the interpretation of a lease provision should be governed by the intent of the parties as expressed in the entire lease contract. Where the lease terms are clear and unambiguous, courts look to the lease alone to find the intention of the parties. And, a lease should not be construed in a manner that would render any of its provisions meaningless or mere

---

[5] (Punctuation omitted.) *TELA Investments v. Razavi*, 351 Ga. App. 518, 519 (2) (831 SE2d 175) (2019).

surplusage. . . . Generally, construction of a lease is a question of law for the court.[6]

As the Lease shows, Paragraph 9.4 allows for termination of the Lease in case of a fire either within 60 days of the event provided the premises is rendered wholly untenable or within 20 days of the Landlord determining that the restoration cost exceeds the aggregate sum of the minimum rent for the lease year. The Tenant first focuses on the provision allowing for termination within 60 days of a fire, arguing that it was not served with the notice of termination. The notice of termination was served upon Anchorex, Inc., which Jerel Cooper, the property manager for Selig Enterprises ("Selig"), the owner of Shops at 2221 Peachtree, testified was the name given to Selig initially through the application process by Efeutlateh. Efeutlateh owns and manages the Tenant, and serves as its registered agent for service of process. Efeutlateh testified that the Tenant's registered agent address was the address at which the notice of termination was served and that he receives mail at that address. Efeutlateh also acknowledged that he is an executive officer with Anchorex, and although Anchorex was listed as the tenant, the Landlord eventually determined that Preview

---

[6] (Citations and punctuation omitted.) *Outfront Media v. City of Sandy Springs*, 356 Ga. App. 405, 418 (2) (847 SE2d 597) (2020).

Restaurant was the actual tenant. This evidence supports the trial court's factual finding that Efeutlateh was properly served and authorized to accept service on the Tenant's behalf.[7]

Even if we concluded, however, that the notice was not sent properly under the 60-day notice provision, it was certainly proper under the 20-day notice provision. The Lease provided that the Landlord had 20 days to give notice of termination after ascertaining the approximate or exact restoration cost, and the Lease defines "restoration cost" as the "total cost to restore damage or destruction to the Premises." The Tenant argues that the Landlord was required to give the 20-day notice within 20 days of learning the remediation cost because it independently exceeded the aggregate minimum yearly rent, but the Lease does not so provide. As stated earlier, it defined restoration cost as "the total cost to restore damage or destruction to the Premises."

---

[7] See *Winstar Dev., Inc. v. Suntrust Bank*, 308 Ga. App. 655, 658 (1) (708 SE2d 604) (2011) ("[W]here a defendant claims there was a failure of service, the trial court has the authority to decide as a factual matter whether service has occurred. This finding will not be disturbed as long as there is some evidence to support it.") (punctuation omitted).

"We generally accept that contractual terms carry their ordinary meanings."[8] There was testimony that the remediation phase included removing water and debris occasioned by the fire event, that restoration entailed completing the build out of the premises and restoring it to its pre-fire condition, and that the remediation had to be completed before the restoration could begin. The Lease clearly contemplated a calculation of the total cost and did not require the Landlord to take action to terminate the lease until after that total cost was obtained, which the record shows occurred on April 18, 2023, a day before the Landlord sent its notice to terminate the lease. Accordingly, the Tenant's argument that the lease was not properly terminated fails.

2. Next, the Tenant argues that the trial court erred when it admitted the restoration cost estimate because it was inadmissible hearsay. The Landlord counters that the estimate was admissible under the business record exception to the hearsay rule. We agree with the Landlord.

Pursuant to OCGA § 24-8-803 (6), the following documents are not subject to exclusion under the hearsay rule:

---

[8] (Punctuation omitted.) *Langley v. MP Spring Lake*, 307 Ga. 321, 325 (834 SE2d 800) (2019).

Unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness . . . , a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, if (A) made at or near the time of the described acts, events, conditions, opinions, or diagnoses; (B) made by, or from information transmitted by, a person with personal knowledge and a business duty to report; (C) kept in the course of a regularly conducted business activity; and (D) it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness.

Bonnie Dean, the senior vice president of the construction department at Selig, testified that she received the estimate, which was dated April 18, 2023, on that same day, that it was the type of document she received in the regular course of business in her role as senior vice president, and that the document was the type that was regularly incorporated into and maintained in the business records of Selig and the type that she regularly relied on in conducting business for Selig.

We have held that "it is not necessary that the person who actually prepared the business record testify, nor that the document be prepared by the business which has custody of it, so long as other circumstantial evidence suggests the trustworthiness of

the record."[9] Additionally, "[i]t is within the trial court's discretion to determine whether a proper foundation was laid for application of the business records exception to a particular document."[10] Dean's testimony sufficiently provided a foundation for the admission of the estimate as a business record. Therefore, the Tenant has not established error in this regard.

The Tenant argues that *Groover v. Groover*[11] demands a different result, but that case is not analogous to the instant case. In *Groover*, a divorce action, the wife attempted to introduce estimates prepared by contractors for repairs.[12] Unlike the instant case, there appears to have been no testimony in *Groover* to establish a foundation for admission of the records under the business record exception. The Tenant's argument that the preparer of the estimate was required to testify in order

---

[9] *Ciras, LLC v. Hydrajet Technology, LLC*, 333 Ga. App. 498, 501 (773 SE2d 800) (2015) (reversing the trial court's exclusion of a business record based on the lack of personal knowledge of the senior vice president, who averred that the document was kept in the regular course of business, among other things). See also *In the Interest of L-M. C. L.*, 362 Ga. App. 520, 527 (1) (869 SE2d 161) (2022).

[10] (Punctuation omitted.) See *Cyrus*, 333 Ga. App. at 501.

[11] 279 Ga. 507 (614 SE2d 50) (2005).

[12] See id. at 508 (3).

for it to be admissible is not supported by the law. Accordingly, this enumeration of error, too, fails.

*Judgment affirmed. Hodges and Watkins, JJ., concur.*